| | | |
|---|---|---|
| **DEE A. VARGAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV 55 JCH (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the applications of Dee A. Vargas for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Complaint (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 15).

## Procedural History

On March 6, 2003, plaintiff filed her application for Disability Insurance Benefits and Supplemental Security Income, claiming that she became unable to work due to her disabling

condition on August 16, 2000.[1]  (Tr. 44-46).  This claim was denied initially, and following an

administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law

Judge (ALJ), dated September 22, 2004.  (Tr. 21-28, 13-17).  Plaintiff then filed a request for

review of the ALJ's decision with the Appeals Council of the Social Security Administration

(SSA), which was denied on January 28, 2005.  (Tr. 7, 4-6).  Thus, the decision of the ALJ stands

as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481 (2003).

### Evidence Before the ALJ

**A.**    **ALJ Hearing**

Plaintiff's administrative hearing was held on May 17, 2004. (Tr. 220).  Plaintiff was

present and was represented by a non-attorney representative.  (Id.).  The ALJ began by admitting

a number of exhibits into evidence.  (Id.).  Plaintiff's representative then examined plaintiff, who

testified that she was 33, and has a twelve-year-old daughter and a seven-year-old son.  (Tr. 221).

Plaintiff stated that she has been married for fourteen years and lives with her husband, who is

employed as a bricklayer.  (Id.).  Plaintiff testified that she graduated from high school and

attended two years of college.  (Tr. 221-22).  Plaintiff stated that she last worked in December of

2002.  (Tr. 222).  Plaintiff testified that in the fall of 2002 she worked one day a week as a

daycare provider.  (Id.).

The ALJ next examined plaintiff, who testified that she had not been employed for over a

year prior to working at the daycare in the fall of 2002.  (Id.).  Plaintiff stated that the last time

she worked full-time was in August of 2001, when she lived in Tennessee.  (Id.).  Plaintiff testified

---

[1]Plaintiff filed a prior application for benefits under Titles II and XVI, which was denied at
the reconsideration level on January 16, 2001.  (Tr. 13).

that she worked at temporary jobs during this time. (Id.). Plaintiff stated that she worked as a tax preparer during tax season. (Tr. 222-23). Plaintiff testified that she performed sedentary secretarial work for the American Heart Association and for a book publishing house. (Tr. 223). Plaintiff stated that the position at the book publishing house involved typing labels and assembling books while sitting down. (Id.). Plaintiff testified that she worked at the book publishing house in the summer of 2001. (Id.). Plaintiff indicated that she was experiencing difficulty remembering the dates that she worked at specific positions. (Id.). Plaintiff then testified that she did not work when she lived in Tennessee. (Tr. 224). Plaintiff stated that she took courses in tax preparation and medical transcription while she lived in Tennessee. (Id.). Plaintiff testified that she never worked in the medical transcription field, despite completing a sixteen week medical transcription course, because she was unable to take a required test due to her medical problems. (Tr. 224-25).

Plaintiff's representative next examined plaintiff, who testified that she has required insulin for her diabetes for eleven years. (Tr. 225). Plaintiff stated that her physician prescribed an insulin pump because her blood sugar levels would fluctuate between very low levels and very high levels. (Id.). Plaintiff testified that her blood sugar levels have ranged between 28 and 600. (Id.). Plaintiff stated that the widest range she has had lately was 357, which occurred two weeks prior to the hearing. (Tr. 226). Plaintiff explained that her blood sugar level was 39 the morning of the hearing, which woke her from her sleep. (Id.). Plaintiff testified that her condition has improved since she switched from insulin shots to the insulin pump, although she still experiences fluctuations. (Id.). Plaintiff stated that she experienced fluctuations in her blood sugar levels when she worked as a tax preparer. (Id.). Plaintiff testified that she was not extremely busy when

she worked at this position so she was able to take breaks when necessary. (Id.).

Plaintiff stated that Dr. John Russell is her treating physician. (Id.). Plaintiff's representative then provided the ALJ with a summary of Dr. Russell's treatment notes. (Tr. 227). Plaintiff's representative stated that in 2001 and 2002, Dr. Russell frequently diagnosed plaintiff with insulin dependent diabetes mellitus (IDDM)[2] with peripheral neuropathy.[3] (Id.). He stated that Dr. Russell also mentioned problems with decreased sensation. (Id.). Plaintiff's representative testified that since 2003, Dr. Russell has not provided many comments in his treatment notes and just continues to diagnose plaintiff with IDDM. Plaintiff's representative stated that Dr. Russell has discussed obtaining a new insulin pump for plaintiff because her current pump is getting old. (Id.). He testified that Dr. Russell's notes document phone calls from plaintiff reporting problems with her blood sugar levels. (Id.). Plaintiff's representative stated that Dr. Russell has also noted issues with depression, although plaintiff has not received significant psychiatric treatment. (Id.).

The ALJ then questioned plaintiff, who testified that Dr. Russell told her to "take baby steps." (Id.). Plaintiff explained that when she told Dr. Russell she was considering working at the daycare, Dr. Russell advised her to try working, although it may be too difficult for her. (Tr. 228). Plaintiff testified that Dr. Russell has been trying to find the right combination of

---

[2]Form of diabetes usually of abrupt onset during the first two decades of life and characterized by excessive thirst, excessive excretion of urine, increased appetite, weight loss, low plasma insulin levels, and susceptibility to ketoacidosis. Stedman's Medical Dictionary, 490 (27th Ed. 2000).

[3]This most common chronic complication of diabetes can cause diminished sensitivity to stimulation (hypesthesia), abnormal acuteness of sensitivity to stimulation (hyperesthesia), abnormal sensations (paresthesia), and loss of temperature and vibratory sense. See Stedman's at 1212.

medications that will treat the pain caused by both the neuropathy and the arthritis.[4] (Id.).
Plaintiff stated that she has been under the care of Dr. Russell for several years, beginning less
than a year after she was diagnosed with diabetes. (Id.). Plaintiff testified that she wears
eyeglasses, which correct her vision. (Id.).

Plaintiff's representative stated that plaintiff uses a wheelchair occasionally, due to the
neuropathy, pain, and numbness. (Tr. 229). Plaintiff's representative instructed plaintiff to
elaborate on her symptoms that produce fatigue. (Id.). Plaintiff testified that the diabetes has not
affected her eyes yet. (Id.). Plaintiff stated that the neuropathy developed about a year and a half
after she was diagnosed with diabetes. (Id.). Plaintiff testified that she experiences constant pain
in her legs due to the neuropathy. (Id.). Plaintiff stated that the neuropathy and the arthritis in
her knees and hips cause her to drag her legs when she walks. (Id.). Plaintiff testified that she
now has back problems due to the way she walks. (Id.). Plaintiff stated that she experiences
sensitivity in the bottoms of her feet, which causes her to become very tired after walking. (Id.).

Plaintiff's representative stated that plaintiff's alleged onset date is December of 2002.
(Tr. 230). Plaintiff's representative testified that plaintiff was insured for Title II benefits through
March 31, 2003. (Id.). He stated that plaintiff filed her application for Title II benefits
concurrently with her application for Title XVI benefits. (Id.). The AL then noted that plaintiff's
medical records reveal findings of a normal range of motion. (Id.). Plaintiff's representative
stated that plaintiff's condition does not meet a listing because there is no persistent
disorganization of two or more extremities. (Id.). Plaintiff's representative further stated that

---

[4]Arthritis is the inflammation of a joint or a state characterized by inflammation of joints.
See Stedman's at 149.

plaintiff experiences chronic fatigue and fluctuating blood sugar levels despite prescribed therapy, which affects her ability to maintain continuous gainful employment.  (Id.).  Plaintiff's representative stated that although plaintiff's treatment notes show that she has full range of motion, these notes do not account for the pain and fatigue plaintiff experiences.  (Id.).

###    B.    Relevant Medical Records

On October 21, 1994, plaintiff was seen by neurologist David Lee, M.D., at the request of her treating physician, Daniel S. Duick, M.D.  (Tr. 195).  Plaintiff reported that in June of that year she had developed burning pain in her knees and calves, as well as tingling sensations in her lower legs.  (Id.).  A Nerve Conduction Study revealed a mild polyneuropathy[5] involving the lower limbs.  (Tr. 196).  Dr. Lee recommended that plaintiff pursue sedentary work.  (Id.).

The record reveals that plaintiff was treated by Dr. Conrado B. Sioson at The Medical Clinic of Jackson, Inc., from September 29, 1999 through August 1, 2001.  (Tr. 201-11).  Plaintiff was treated for diabetes management, pain in her legs, and joint pain in her arm and throughout her body.  (Id.).  Dr. Sioson prescribed Elavil,[6] Relafen,[7] Paxil,[8] Darvocet,[9] Vioxx,[10] and an insulin

---

[5]A nontraumatic generalized disorder of peripheral nerves, affecting the distal fibers most severely.  See Stedman's at 1422.

[6]Elavil is an antidepressant indicated for the treatment of symptoms of depression and chronic pain.  See Physician's Desk Reference (PDR), 549 (54th Ed. 2000).

[7]Relafen is indicated for the treatment of signs and symptoms of arthritis.  See PDR at 3036.

[8]Paxil is an antidepressant indicated for the treatment of depression.  See PDR at 3027-28.

[9]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 1574.

[10]Vioxx is indicated for the relief of osteoarthritis.  See PDR at 1913.

pump for plaintiff's diabetes. (Id.).

Plaintiff presented to the emergency room at Southeast Missouri Hospital on August 28, 2001, complaining of pain in the left foot. (Tr. 118). Plaintiff underwent x-rays of her left foot, which revealed no evidence of fractures. (Id.). The impression of Danny T. Berry, M.D. was left foot pain, rule out strain or contusion. (Id.). Plaintiff was prescribed Vicodin[11] for pain and was discharged. (Id.).

Plaintiff saw John J. Russell, M.D. on October 11, 2001, at which time plaintiff complained of joint pain. (Tr. 154). Plaintiff's medications were noted to be insulin pump, Paxil, and Darvocet. (Id.). Dr. Russell's diagnosis was Type I Diabetes.[12] (Id.). Dr. Russell ordered a series of tests. (Id.).

Plaintiff presented to Jeffrey P. Appleman, D.P.M., on January 11, 2002. (Tr. 107). Plaintiff complained of pain in her left foot, which had been present for several months. (Id.). Plaintiff underwent x-rays, which revealed no evidence of fracture or dislocation. (Id.). Dr. Appleman found increased pressure in the heel area of plaintiff's foot, and prescribed orthotics. (Id.).

Plaintiff presented to Rickey L. Lents, M.D., on March 14, 2002, complaining of right wrist pain. (Tr. 112). Dr. Lents noted that he had excised a cyst on plaintiff nine years ago. (Id.). Plaintiff reported that she began experiencing pain six months prior to her visit and noted a recurrence of the mass under the old scar. (Id.). Dr. Lent diagnosed plaintiff with recurrent

---

[11]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 1502.

[12]Synonym for IDDM. See Stedman's at 491.

ganglion cyst,[13] right wrist. (Tr. 111). Dr. Lents scheduled an excisional biopsy. (Id.). Dr. Lent performed surgery on April 1, 2002, during which he removed scar tissue in plaintiff's right wrist. (Id.).

Plaintiff saw Dr. Russell on August 22, 2002, to discuss Paxil and Ultracet.[14] (Tr. 151). Plaintiff requested a high dose of Paxil, as she claimed Ultracet did not relieve her neuropathic pain. (Id.). Plaintiff complained of depression and anxiety, although she denied memory loss, mental disturbance, suicidal ideation, hallucinations, and paranoia. (Id.). Dr. Russell's assessment was depression; IDDM; and diabetic peripheral neuropathy. (Tr. 152). Dr. Russell prescribed Paxil, Ultracet, insulin pump, and Darvocet. (Tr. 152-53).

Plaintiff saw Dr. Russell on September 23, 2002, at which time she complained of congestion. (Tr. 148). Dr. Russell noted that plaintiff's peripheral neuropathy, IDDM, and depression remained unchanged. (Tr. 149). Dr. Russell added Bextra[15] to plaintiff's list of prescription medications. (Id.).

Plaintiff saw Dr. Russell on November 6, 2002, at which time she complained of low back pain, depression, and anxiety. (Tr. 145). Plaintiff reported that the Ultracet provided relief, but that she would like to increase the dosage of Paxil to relieve her anxiety. (Id.). Upon physical examination, Dr. Russell found plaintiff's gait to be normal. (Tr. 146). Dr. Russell found that plaintiff had normal spinal mobility, and normal ranges of motion in both arms and both legs. (Id.). A mental status exam revealed no depression, anxiety, or agitation. (Tr. 147). Dr.

---

[13]A cyst containing nerve cells. See Stedman's at 726.

[14]Ultracet is indicated for the management of acute pain. See PDR at 2550.

[15]Bextra is indicated for the relief of signs and symptoms of arthritis. See PDR at 2696.

Russell's assessment was unchanged IDDM, unchanged diabetic peripheral neuropathy, and deteriorated depression. (Id.). Dr. Russell added Skelaxin[16] to plaintiff's prescription medications. (Tr. 146).

Plaintiff saw Dr. Russell on December 18, 2002, at which time she complained of back pain, weakness, depression, and anxiety. (Tr. 141). Plaintiff reported that her back had gotten progressively worse over the past two weeks and that she was using a scooter around the house. (Id.). Dr. Russell found that plaintiff had a very stiff walk and did not want to sit. (Tr. 142). He found that plaintiff's range of motion in the arms and legs was normal. (Tr. 143). Dr. Russell found pararvertebral spasm.[17] (Tr. 142). Dr. Russell found no signs of depression, anxiety, or agitation. (Id.). Dr. Russell's assessment was unchanged depression, unchanged IDDM, and unchanged diabetic peripheral neuropathy. (Id.). Dr. Russell recommended physical therapy and limited plaintiff's lifting to twenty pounds. (Id.). Dr. Russell administered a Toradol[18] injection, prescribed Percocet[19] and Celebrex,[20] and discontinued the Skelaxin and Bextra. (Id.). He also ordered an MRI.[21] (Id.).

---

[16]Skelaxin is indicated for the relief of discomforts associated with acute, painful musculoskeletal conditions. See PDR at 909.

[17]A sudden involuntary contraction of muscles alongside a vertebra or the vertebral column. See Stedman's at 1315, 1662.

[18]Toradol is a nonsteroidal anti-inflammatory drug indicated for the short-term management of moderately severe acute pain. See PDR at 2673.

[19]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1037.

[20]Celebrex is indicated for the relief of the signs and symptoms of arthritis. See PDR at 2335.

[21]Magnetic Resonance Imaging. Stedman's at 1135.

Plaintiff underwent an MRI of the lumbar[22] spine on December 21, 2002. (Tr. 116). The reviewing physician's impression was: mild discogenic bulge at L4-5[23] and L5-S1[24] in the midline without disk herniation or compression of adjacent neural structures; and incidental lipoma[25] in the body of L1. (Id.).

On December 26, 2002, plaintiff was evaluated for physical therapy by Brenda Nicolai of the Southeast Hospital Outpatient Rehabilitation facility. (Tr. 114-15). Plaintiff complained of low back pain that had been present since the end of September 2002. (Tr. 114). Plaintiff reported that her back pain was probably related to the fact that she started working at a daycare lifting small children in September. (Id.). Plaintiff stated that she stopped working at the daycare in October due to the severity of the pain. (Id.). Plaintiff stated that all activities increase her back pain, and her pain is relieved by changing positions frequently and by using a heating pad on her back. (Id.). Plaintiff reported that she can stand for ten minutes, sit for thirty minutes, and walk for short distances with pain. (Id.). Plaintiff also reported that her sleep is disturbed by her pain. (Id.). Plaintiff stated that her pain extends across the low back area but does not radiate into her leg. (Id.). Plaintiff rated her pain as a five on a scale of five to ten. (Id.). Plaintiff's

---

[22]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[23]"L" is the abbreviation for lumbar vertebrae (L1 to L5). See Stedman's at 956.

[24]"S" is the abbreviation for sacral vertebrae (SI to S5). See Stedman's at 1586.

[25]A benign tumor composed of mature fat cells. See Stedman's at 1021.

medications were noted to be Humalog,[26] Paxil, Ultracet, and Percocet. (Id.). Upon physical examination, Ms. Nicolai found that plaintiff had a decreased lumbar lordosis.[27] (Tr. 115). Ms. Nicolai stated that plaintiff ambulated at a very slow pace, her stride length was decreased bilaterally, and she had an increased lateral sway to the right and left when walking. (Id.). Ms. Nicolai reported that plaintiff's flexion in standing was 1/4 of normal, extension in standing was almost 0, side bending and side gliding of the hips was ½ of normal, and flexion in the lying position was 3/4 of normal. (Id.). Ms. Nicolai's assessment was: pain limiting all activities, decreased range of motion in all directions, and inability to care for herself independently. (Id.). Ms. Nicolai's physical therapy goals were described as follows: to decrease plaintiff's pain from a five to a three on a scale of one to ten; to increase plaintiff's range of motion to at least 3/4 of normal in all directions; to allow plaintiff to be independent in her home exercise program; and to allow plaintiff to resume driving and caring for herself without an increase in pain. (Id.).

Plaintiff participated in physical therapy at Southeast Missouri Hospital Outpatient Rehabilitation from December 26, 2002 through March 12, 2003. (Tr. 122-130). The physical therapy treatment notes reveal that plaintiff's strength slowly improved and that plaintiff indicated that the physical therapy provided significant symptom relief. (Id.). Plaintiff, however, reported increased back pain after taking a number of weekend-long motor trips. (Tr. 122, 126-28). On March 12, 2003, at plaintiff's last physical therapy visit, Ms. Nicolai indicated that plaintiff had

_____

[26]Insulin. See PDR at 1593.

[27]Lumbar lordosis is the normal, anteriorly convex curvature of the lumbar segment of the vertebral column. See Stedman's at 1032.

full hip and knee range of motion. (Tr. 122). Plaintiff indicated on this date that the Celebrex she had been taking provided relief for her pain. (Id.).

Plaintiff saw Dr. Russell on March 14, 2003, for a follow-up after participating in physical therapy and taking Celebrex. (Tr. 135). Plaintiff reported that her back pain had improved, although she was experiencing knee pain. (Id.). Plaintiff stated that the Celebrex helped somewhat, but plaintiff's mother reported that plaintiff's depression and anxiety were worse. (Id.). Plaintiff stated that she was no longer taking her Paxil due to lack of funds. (Id.). Plaintiff's medications were listed as Paxil, Ultracet, Humalog pump, Darvocet, and Celebrex. (Id.). Dr. Russell's assessment was: deteriorated depression, unchanged IDDM, unchanged diabetic peripheral neuropathy, and improved back pain. (Tr. 136). Dr. Russell continued plaintiff's medication regime and urged plaintiff to restart the Paxil. (Id.).

On June 27, 2003, a state agency medical consultant completed a physical residual functional capacity assessment based on a review of plaintiff's medical records. (Tr. 163-171). The medical consultant expressed the opinion that plaintiff could lift or carry ten pounds occasionally; lift or carry less than ten pounds frequently; stand or walk at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push or pull an unlimited amount; and had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 166-68).

On June 30, 2003, a state agency medical consultant, James Spence, Ph.D., completed a Psychiatric Review Technique based on a review of plaintiff's medical records. (Tr. 172-85). Dr. Spence expressed the opinion that plaintiff suffers from depression secondary to physical complaints. (Tr. 184). Dr. Spence stated that plaintiff has a mild restriction in her activities of

daily living, mild difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace.  (Tr. 182).  Dr. Spence found plaintiff's condition to be non-severe and found her allegations to be partially credible.  (Id.).

The record reveals that plaintiff called Dr. Russell's office on August 1, 2003 and on August 4, 2003, complaining of high blood sugar levels, headaches, and nausea.  (Tr. 186-87).  Plaintiff saw Dr. Russell on August 6, 2003 for these complaints.  (Tr. 188).  Plaintiff also reported experiencing some back pain, although she denied experiencing joint pain, joint swelling, muscle cramps, muscle weakness, or arthritis.  (Id.).  Plaintiff's medications were listed as Paxil, Ultracet, Humalog pump, Darvocet, and Flexeril.[28]  (Tr. 189).  Plaintiff's gait was found to be normal.  (Id.).  Dr. Russell noted that plaintiff could participate in an exercise program.  (Id.).  Dr. Russell found that plaintiff had normal range of motion in her spine.  (Id.).  A mental status exam revealed no evidence of depression, anxiety, or agitation.  (Tr. 190).  Dr. Russell's diagnoses remained unchanged.  (Id.).  He adjusted plaintiff's insulin pump and recommended that plaintiff return in three months.  (Id.).

Plaintiff called Dr. Russell's office on January 7, 2004, and inquired about resuming physical therapy for her back, as she was still experiencing back pain.  (Tr. 191).  Dr. Russell's office scheduled physical therapy for plaintiff.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act

---

[28]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions.  See PDR at 1797.

and is insured for benefits through March 31, 2003.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's diabetes, neuropathy, and arthritis are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity to perform work at the sedentary level.

7.    The claimant's past relevant work as a tax preparer and secretary did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.    The claimant's medically determinable diabetes, neuropathy, and arthritis do not prevent the claimant from performing her past relevant work as a tax preparer or secretary.

9.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through her date last insured of March 31, 2003 (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on March 6, 2003, the claimant is not entitled to a period of disability, Disability Insurance Benefits, and not eligible for Supplemental Security Income payments under Sections 216(I), 223, 1602, and 1614(a)(3)(A) respectively, of the Social Security Act.

(Tr. 17).

**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.


**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

- 15 -

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.    Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.

**1.    Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff specifically argues that the ALJ erred by not properly considering the Polaski factors in making his determination.  Defendant argues that the ALJ made a proper credibility determination and found that plaintiff's allegations of pain were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. Plaintiff claims that the ALJ erred in finding that plaintiff's subjective complaints of disabling pain are not fully supported by the evidence, despite the objective medical evidence of

plaintiff's impairments. Plaintiff mischaracterizes the nature of a finding of pain in the medical evidence. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In this case, the ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain. Although the ALJ did not cite Polaski, he did cite the proper regulations, 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Ruling 96-7p. (Tr. 15). As such, there is no error in the omission of a Polaski citation. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).

The ALJ first discussed the medical evidence. The ALJ noted that, although there is evidence of fluctuations in plaintiff's blood sugar levels, there is no evidence that plaintiff has ever been hospitalized due to her diabetes. The ALJ stated that plaintiff was evaluated by a neurologist for complaints of leg numbness and pain in 1994 and was diagnosed with mild polyneuropathy of the lower extremities. The ALJ further stated that the neurologist recommended that plaintiff pursue sedentary work. The ALJ noted that plaintiff has not been examined or treated by a neurologist since November 1994.

The ALJ next pointed out that plaintiff began complaining of low back pain in the fall of 2002, concurrent with her starting work as a childcare provider, which involved lifting small children. The ALJ stated that an MRI of plaintiff's lumbar spine revealed only mild discogenic bulges at two disc levels, with no disc herniation or nerve compression. The ALJ noted that

plaintiff's physical therapy records from December 2002 to March 12, 2003 document that plaintiff reported significant symptom relief from her medication, home exercises, and therapy. In fact, on plaintiff's last physical therapy visit on March 12, 2003, her physical therapist noted that plaintiff had full hip and knee range of motion and that the Celebrex plaintiff had been taking provided symptom relief. (Tr. 122). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999). Finally, the ALJ stated that there is no documentation in the medical record of plaintiff experiencing difficulty with fatigue or stamina that would prevent her from performing sedentary work on a regular basis.

The ALJ next discussed plaintiff's daily activities. First, the ALJ stated that plaintiff's physical therapy notes reveal that plaintiff took several weekend car trips, and hosted a birthday party at her home for her son during this period. The ALJ noted that plaintiff's written statement regarding her daily activities indicates that she is able to take care of most of her personal and grooming needs, drive a car, shop for groceries twice a week by using a motorized cart for extended periods of shopping, attend church services, attend her son's sporting events, dust, fold clothes, and cook. Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ concluded that plaintiff's allegations regarding her limitations were "not totally credible for the reasons set forth in the body of the decision." (Tr. 17).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley, 253 F.3d at 1092. However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a

claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.     Residual Functional Capacity

Plaintiff next argues that the ALJ erred in assessing her residual functional capacity. Specifically, plaintiff contends that the ALJ arbitrarily assessed a residual functional capacity that is not based on any medical evidence. Defendant contends that the ALJ properly formulated plaintiff's residual functional capacity based upon all the credible evidence of record.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

After discussing the objective medical evidence and plaintiff's own statements regarding her impairments, the ALJ concluded:

> [a]fter reviewing the evidence of record, it is evident that the claimant's neuropathy and arthritis result in significant limitations in her ability to stand/walk for extended periods or lift/carry more than nominal weight. Accordingly, the undersigned finds the claimant retains the following residual functional capacity: lift/carry a maximum of 10 pounds; sit for a total of approximately 6 hours in an 8-hour workday; and stand/walk for a total of approximately 2 hours in an 8-hour workday. There is no medical evidence to support a finding that the claimant was incapable of sedentary work prior to March 31, 2003.

(Tr. 16). Contrary to plaintiff's claim that the ALJ's residual functional capacity determination was arbitrary and not based on any medical evidence, the ALJ assessed a residual functional capacity that is consistent with the record as a whole.

In 1994, Dr. Duick recommended that plaintiff seek sedentary work. (Tr. 196). The only restriction of plaintiff's treating physician, Dr. Russell, was imposed on December 18, 2002, when he recommended that plaintiff limit her lifting to twenty pounds. (Tr. 142). On the same date, Dr. Russell also recommended physical therapy, which plaintiff successfully completed on March 12, 2003. On March 14, 2003, the last visit prior to plaintiff's date last insured, Dr. Russell found that plaintiff's back pain had improved. (Tr. 136). On August 1, 2003, plaintiff's last visit with Dr. Russell contained in the record, Dr. Russell found plaintiff's gait to be normal, and found that plaintiff had normal range of motion in her spine. (Tr. 189). Further, Dr. Russell found no evidence of depression, anxiety, or agitation. (Tr. 190).

The state agency medical consultant expressed the opinion that plaintiff could lift or carry ten pounds occasionally; lift or carry less than ten pounds frequently; stand or walk at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push or pull an unlimited amount. (Tr. 166). With regard to plaintiff's psychiatric impairments, the state agency psychiatric consultant expressed the opinion that plaintiff suffers from non-severe depression secondary to physical complaints, which causes only a mild restriction in her activities

- 22 -

of daily living and ability to maintain social functioning. (Tr. 182-84). The ALJ noted in his opinion that, although he provided plaintiff with additional time after the hearing to obtain medical evidence of plaintiff's functional restrictions, no report or residual functional capacity assessment was submitted from Dr. Russell. (Tr. 16).

The residual functional capacity formulated by the ALJ is consistent with the medical evidence. The ALJ's residual functional capacity is actually more restrictive than the only limitation imposed by plaintiff's treating physician, Dr. Russell. On December 18, 2002, Dr. Russell limited plaintiff's lifting to twenty pounds, whereas the ALJ found that plaintiff could lift no more than ten pounds. It is notable that Dr. Russell imposed this limitation before plaintiff started physical therapy, as Dr. Russell noted that plaintiff's back pain had improved after she completed physical therapy. The ALJ's residual functional capacity is also consistent with the assessment of the consulting physician. Notably, none of plaintiff's physicians have expressed the opinion that plaintiff is unable to perform sedentary work. Further, at the hearing, plaintiff complained only of neuropathic pain in her legs, which the ALJ took into account when formulating his residual functional capacity.

In light of the evidence in the record, including the opinion of Dr. Russell, and plaintiff's own testimony, there is substantial evidence in the record as a whole to support the ALJ's determination that plaintiff retains the residual functional capacity to perform sedentary work

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying

plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act

and Supplemental Security Income benefits under Title XVI of the Act, be **affirmed**.


The parties are advised that they have eleven (11) days, until August 25, 2006, to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result in

a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th

Cir. 1990).


Dated this 14th  day of August, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE